JAN 2 3 2018

VEDA EVANS,

    Plaintiff,

v.          Civil No. 2:17cv153

FORKIDS, INC.,

    Defendant.

## OPINION & ORDER

This matter is before the Court on a motion for summary judgment filed by ForKids, Inc. ("Defendant"). ECF No. 14. Plaintiff Veda Evans ("Plaintiff"), a participant in Defendant's permanent supportive housing program, filed the instant civil action challenging the timeliness and efficacy of Defendant's response to Plaintiff's requests for modifications to her home and/or necessary accommodations due to Plaintiff's disability. ECF No. 1. On December 15, 2017, this Court conducted a hearing on Defendant's motion, and heard detailed arguments from counsel for both parties regarding the facts of the case, Plaintiff's burden of proof, and whether the inferences that Plaintiff asserts can be drawn from the undisputed facts are "reasonable" and could support a verdict in Plaintiff's favor. For the reasons set forth below, Defendant's motion for summary judgment is **GRANTED**.

## I. Factual Background

With the exception of the parties' diverging viewpoints as to whether the factual record reasonably supports an inference of discriminatory intent, the material facts in this case are largely undisputed. Drawing primarily from Plaintiff's recitation of the facts, Defendant is a non-profit provider of shelter and housing services assisting homeless families, and it receives funding from the United States Government to provide its services. Plaintiff is a disabled mother of three young children. Plaintiff was initially placed in one of Defendant's short-term housing assistance programs, but ultimately entered Defendant's permanent supportive housing program. Plaintiff's medical conditions worsened during the time that she participated in Defendant's programs, and in early 2015, Defendant equipped Plaintiff's apartment residence with a toilet lift and tub handles. In September of that same year, a fire in an adjacent unit caused damage to Plaintiff's home, and when Plaintiff moved back into her unit in November of 2015, the toilet lift and tub handles were purportedly damaged or destroyed. Moreover, due to Plaintiff's continuing worsening condition, by the end of January of 2016, Plaintiff required full-time use of a wheelchair, grab bars for the toilet and shower, and a tub transfer bench. Because Plaintiff's unit was elevated, her need to utilize a wheelchair required either:

(1) that a ramp be constructed to allow her to enter and exit her home; or (2) a transfer to a different unit that was either not elevated or that already had a wheelchair ramp.

After Plaintiff informed Defendant of her needs in late January, 2016, Defendant explored both possibilities (ramp construction and transfer), and Defendant's communications with Plaintiff, various state and federal agencies, and disability contractors, are documented in emails, case reports, progress notes, and narratives that were created between late January and early March of 2016.  Such documents, which are included in the record before the Court, also address the handling of Plaintiff's request for modifications to her bathroom, to include the installation of grab bars near the toilet and a transfer bench for the tub.

While Plaintiff discusses many of these record documents in a section of her brief in opposition to summary judgment titled "Disputed Facts and Facts with Disputed Inferences," Plaintiff's discussion of such exhibits reveals that Plaintiff does not dispute the actual facts documented therein, but rather, disputes whether Defendant's actions raise an inference of discriminatory intent.  Stated differently, Plaintiff does not contest the accuracy of the factual record produced by Defendant in support of summary judgment, but instead, asserts that Defendant's own facts, supplemented by Plaintiff's affidavit and

additional exhibits, clarify and/or add a "gloss" to Defendant's facts that is favorable to Plaintiff's position in this litigation. Plaintiff asserts that when reasonable inferences are drawn in her favor, these clarifications and additional facts demonstrate both Defendant's discriminatory intent and its failure to timely modify Plaintiff's residence or otherwise accommodate Plaintiff's disability.

Summarizing the material facts contained in the most relevant exhibits:

(1) On or about January 25, 2016, Plaintiff reported to Defendant that she was wheelchair bound and would require a residence with a wheelchair ramp and grab bars in the bathroom and hallway—Defendant immediately began exploring possibilities to address Plaintiff's asserted disability. ECF Nos. 15-4, 15-6.

(2) On January 26, Plaintiff asked Defendant whether she could be moved to a ground floor unit;[1] Defendant informed Plaintiff that it did not have any ground floor units available and that Defendant needed time to evaluate whether Plaintiff's medical condition was temporary (Plaintiff was pregnant at the time) or permanent; Defendant asked permission to speak directly with Plaintiff's doctor to better understand Plaintiff's medical

---

[1] The record establishes that while Plaintiff's unit was a first floor unit, it was elevated several feet and there were multiple stairs leading up to it.

4

needs, or alternatively, asked Plaintiff to provide information in writing from her doctor; Plaintiff was also informed that it was unlikely that any solutions would be immediate as Defendant needed medical information from Plaintiff. ECF Nos. 15-7, 16-14.

(3) In addition to immediately starting a discussion with Plaintiff regarding possible solutions, Defendant's employees internally discussed concerns about Plaintiff's ability to care for herself and her minor children, to include the apparent need to involve Child Protective Services ("CPS")—after such discussions, Defendant contacted CPS. ECF Nos. 15-9, 16-15.[2]

(4) On January 26 and January 27, Defendant began taking steps to schedule an inspection of Plaintiff's residence for a feasibility analysis of potential modifications, including ramp construction, doorway widening (if needed/possible) and installation of grab bars in the shower and near the toilet. ECF No. 15-8.

(5) On February 4, Plaintiff provided a doctor's letter to Defendant indicating that Plaintiff requires: (a) "24/7 assistance for all mobility and is unsafe to be living on her own," and (b) "a hospital bed, wheelchair, grab bars in the bathroom, and a tub transfer bench"; after receiving the letter

---

[2] At the time such contact was made, various agencies, including CPS, previously had contact with Plaintiff as she (and her children) had been evaluated for multiple forms of government assistance.

5

documenting Plaintiff's need for around-the-clock assistance, Defendant again contacted CPS to provide an update on Plaintiff's medical condition. ECF Nos. 15-11, 15-12, 16-20.

(6) On February 8, Defendant contacted Plaintiff by telephone to discuss the doctor's letter and associated concerns; Defendant informed Plaintiff that Defendant cannot provide the level of services that Plaintiff needs and that it will be very important to connect with all available resources; Plaintiff was further informed that Defendant would be reaching out to CPS and Adult Protective Services ("APS") about ongoing services that Plaintiff may be eligible for; during that same conversation, Plaintiff stated that she would look into whether her insurance would provide a tub transfer bench and Defendant indicated that it would look into the grab bars in the bathroom after it confirmed that Plaintiff would be staying in the unit; Defendant further informed Plaintiff that two contractors had already inspected the property regarding the feasibility of building a wheelchair ramp; during this conversation, Defendant again informed Plaintiff that no ground floor units were currently available. ECF No. 16-21.

(7) On February 9, Defendant met with Plaintiff in her home and Plaintiff expressed frustration that she was not being moved into a three bedroom accessible unit; Defendant again informed Plaintiff that no such units were vacant, although Defendant

6

indicated that it would be seeking guidance from the U.S. Department of Housing and Urban Development ("HUD") as to whether any of Defendant's other tenants could be forced to move out of an accessible unit; Plaintiff asked whether a leased unit in the community was an option and Defendant informed her that it was not; Defendant further informed Plaintiff that the ramp quote was around $8,000 and Defendant was still working to determine if it could provide such resource;[3] Defendant explained to Plaintiff that she could move across the street into a two-bedroom unit that could be more easily made wheelchair accessible but Plaintiff indicated that she would not accept such option because the offered unit was too small;[4] during such conversation, Plaintiff raised the issue of "alternative housing" in the community, and Defendant raised concerns about Plaintiff's ability to afford such option. ECF No. 16-23.

(8) Also on February 9, Defendant's employees communicated internally via email, expressly noting that Defendant may be obligated to pay for the requested modifications because Plaintiff's residence is a "HUD funded unit" and the expected

[3] Based on the configuration of Plaintiff's apartment, a simple ramp on the front of the residence was not feasible, thus requiring a large exterior ramp, that included platforms, to be constructed on the rear of the building. ECF Nos. 15-13, 15-24.

[4] The record indicates that Plaintiff was at the time living in a two-bedroom unit, but the two-bedroom unit she rejected was smaller in size. ECF No. 15-15.

7

cost of the changes "does not appear to be a financial burden for our agency from a Fair Housing perspective." ECF No. 15-13.

(9) On February 12, Defendant contacted one of the ramp contractors to determine how quickly a ramp could be built and was told that installation could be completed approximately one week after the job was authorized; Defendant responded to the contractor by indicating that it needed to have a conference call with HUD regarding necessary approvals and that the contractor should hear back from Defendant in the next couple of weeks; on that same day, Defendant sent a lengthy email to HUD asking for an opportunity to discuss Plaintiff's case, and among the multiple issues raised in the email were the possibility of displacing another family to move Plaintiff into an accessible three bedroom unit, the possibility of moving Plaintiff into the ground floor two bedroom unit that Plaintiff had rejected, the need to secure HUD authorization to move money from Defendant's "services" budget to its "operations" budget if a ramp were to be constructed, whether Defendant is legally obligated to perform structural modifications if Plaintiff cannot secure the around-the-clock personal care required by her doctor, and whether Defendant has a legal obligation to provide temporary housing to Plaintiff while the various options were being sorted out. ECF No. 15-15.

(10) On February 17, Defendant had a conference call with HUD to discuss these issues; Defendant called Plaintiff later that same day to share the outcome of the HUD call, noting that, going forward, it was important to address both Plaintiff's need for around-the-clock care and the need for the modifications to her home—Plaintiff expressed frustration that Defendant was not moving quickly enough.[5] ECF Nos. 16-24, 16-25.

(11) On February 18, Defendant called the Virginia Fair Housing Office (based on HUD's recommendation to do so) and received further guidance on these issues, including recommendations that Defendant should proceed with the modifications as soon as possible and should obtain the advice of legal counsel as to certain questions/concerns, ECF No. 15-18; On February 19, Defendant emailed HUD indicating that Defendant planned to move forward with structural modifications to Plaintiff's current unit and therefore needed HUD to approve a change to its grant to allow Defendant to transfer money to fund the construction. ECF No. 15-20.

(12) On that same day (February 19), Plaintiff emailed Defendant, appearing to indicate that she planned on leaving

---

[5] The record reflects that, at times, Plaintiff was very disrespectful to Defendant's employees, although it is unclear the degree to which such behavior was intentionally rude conduct versus conduct motivated by Plaintiff's medical/mental condition. The Court views the motivation behind such conduct in a light most favorable to Plaintiff, and notes that Defendant's interactions with Plaintiff over a lengthy period of time reflect a substantial amount of patience.

Defendant's program because she feared losing her children, although Plaintiff sent a follow up email later that day stating that she wanted to "stay here." ECF No. 16-26.

(13) On February 24, Defendant provided Plaintiff with another update, indicating that Defendant was still waiting on the third quote for the ramp (it had learned that funding rules required three quotes), that the grab bars would be installed as soon as the contractor returned a quote,[6] and that, <u>as requested by Plaintiff</u>, Defendant had conducted research into alternative housing options if Plaintiff decided to leave Defendant's housing program;[7] Plaintiff responded by indicating that staying in her current home was not an option and that Medicaid would not approve her (electric) wheelchair until the improvements were complete—Plaintiff further indicated that Defendant had "called CP's" on her for the last time; Defendant responded by offering to call Medicaid directly on Plaintiff's behalf to

---

[6] The record indicates that one of Defendant's internal maintenance people had planned to install the grab bars as early as February 19; however, he ultimately declined to do so because he was uncomfortable performing the install as he did not know what was necessary to comply with ADA requirements. ECF Nos. 15-19, 15-22. As useful context, HUD regulations governing reasonable modifications to an existing premises provide an example involving installation of "grab bars in the bathroom," and discuss within such hypothetical the necessity of "reinforc[ing] the walls with blocking between studs in order to affix the grab bars." 24 C.F.R. § 100.203.

[7] It is undisputed that Plaintiff's boyfriend, who was employed outside the home, wanted to live with Plaintiff and be her caregiver (when he was available) but he had been <u>banned from Defendant's premises</u> based, in part, on a threat he previously made to one of Defendant's employees. The impediment on joint living would obviously be removed if Plaintiff left Defendant's housing program.

10

confirm that Defendant is, in fact, building the ramp. ECF No. 15-23.

(13) On February 25 and 26, Defendant and Plaintiff had further email exchanges discussing whether Plaintiff was planning on staying in the program or leaving the program; Defendant informed Plaintiff that the final ramp bid should be received in approximately five days and that Plaintiff would have to decide what she wanted to do by then. ECF Nos. 16-29, 16-30.

(14) The following week, Plaintiff confirmed her plan to stay in Defendant's program; on March 7, approximately one month after Plaintiff submitted her doctor's note to Defendant, Defendant sent Plaintiff a lengthy email documenting her final options, which included modifying her current unit, or moving into a three bedroom unit that already had a ramp, although Plaintiff would have to wait a few weeks for the three bedroom unit to be ready (but it would have a ramp, grab bars, and tub transfer bench all installed before move-in);[8] on that same day, Plaintiff indicated that she preferred to "wait" for the three bedroom accessible unit. ECF No 15-29.

---

[8] During the relevant time period, one of Defendant's tenants vacated an upper floor unit and, in early March, Defendant was able to "incentivize" a resident of a lower-level 3 bedroom unit with an existing ramp to move into the upper unit, making a 3-bedroom accessible unit available for Plaintiff. Defendant informed Plaintiff in the March 7 email that the accessible unit would be vacated the following week, and promised such unit to Plaintiff after it had been cleaned, repaired, and fully prepped for Plaintiff's needs, which was expected to be done later that month.

(15) The next day (March 8), Defendant sent Plaintiff a follow up email indicating that Defendant had been in contact with Plaintiff's doctor to inform her of the planned two to three week time table for Plaintiff's move into the accessible three bedroom unit to permit sufficient time to have Plaintiff's hospital bed and electric wheelchair ordered and delivered. ECF No. 15-30.

(16) Several days later, on March 12, Plaintiff caused a kitchen fire in her home, and the following day she did not respond to a "wellness check" performed by Defendant; one of Defendant's employees forced his way into Plaintiff's home to provide any needed assistance and determined that an ambulance was not necessary; after these two incidents, Defendant contacted APS to express concern that it continues to be dangerous for Plaintiff to be in her unit alone. ECF Nos. 15-31, 15-32, 15-33.

(17) on March 15, Plaintiff emailed Defendant indicating that she would like to take the offer for assistance moving out of the program as her "living issues are unsafe"; a moving truck was arranged and scheduled to move Plaintiff out approximately one week later. ECF Nos. 15-34, 15-35.

In March of 2017, Plaintiff filed the instant suit alleging a failure to provide a reasonable modification/accommodation under the Fair Housing Act and discrimination based on her

disability under the Rehabilitation Act. Defendant thereafter filed its summary judgment motion, which is now ripe for review.

## II. Standard of Review

The Federal Rules of Civil Procedure provide that a district court shall grant summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986). A fact is "material" if it "might affect the outcome of the suit," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248; see Jacobs, 780 F.3d at 568. The summary judgment procedure is not "a disfavored procedural shortcut, but rather [is] an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. Proc. 1).

Although the initial burden on summary judgment falls on the moving party, once a movant properly files evidence supporting summary judgment, the non-moving party may not rest upon the mere allegations of the pleadings, but instead must set forth specific facts in the form of exhibits and sworn affidavits illustrating a genuine issue for trial. Id. at 323-24; Butler v. Drive Auto. Indus. of Am., Inc., 793 F.3d 404, 408 (4th Cir. 2015). In other words, while the movant must carry the burden to show the absence of a genuine issue of material fact, when such burden is met, it is up to the non-movant to establish the existence of such an issue. Celotex, 477 U.S. at 322-23.

When evaluating a summary judgment motion, a district court is not permitted "to weigh the evidence and determine the truth of the matter," but must instead "determine whether there is a genuine issue for trial." Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (quoting Anderson, 477 U.S. at 249). Accordingly, "[t]he relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Stewart v. MTR Gaming Grp., Inc., 581 F. App'x 245, 247 (4th Cir. 2014) (quoting Anderson, 477 U.S. at 251-52). In making such determination, "the district court must 'view the

14

evidence in the light most favorable to the' nonmoving party."
Jacobs, 780 F.3d at 568 (quoting Tolan, 134 S. Ct. at 1866).

## III. Discussion

### A. Legal Standard under Relevant Statutes

Plaintiff's civil action seeks monetary relief based on alleged violations of the Fair Housing Act ("FHA") and Section 504 of the Rehabilitation Act. The relevant provisions of the FHA expressly prohibit: (1) "discriminat[ion] in the sale or rental . . . [of] a dwelling to any buyer or renter because of a handicap of that buyer or renter"; and (2) "discriminat[ion] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person . . . ." 42 U.S.C. § 3604(f)(1),(2) (emphasis added). Immediately following such provisions, the FHA states:

> For purposes of this subsection, discrimination includes—
>
> (A) a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises . . . .
>
> (B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.
>
> . . .

15

42 U.S.C. § 3604(f)(3)(A), (B) (emphasis added).

As argued by Plaintiff, 42 U.S.C. § 3604(f) has been applied by federal courts to permit recovery for three types of FHA violations: (1) "intentional discrimination"; (2) practices causing a widespread "discriminatory impact"; and (3) "a refusal to grant a reasonable accommodation or modification request." Pl. Opp'n Memo 13, ECF No. 16 (citing Smith & Lee Associates, Inc. v. City of Taylor, Michigan, 102 F.3d 781, 790 (6th Cir. 1996)). To prove intentional discrimination under § 3604(f)(1) or (f)(2), a plaintiff need not prove that the plaintiff's handicap/disability was the sole motivating factor behind the challenged decision, but rather, need only prove that it was one of several motivating causes. Thomas v. The Salvation Army S. Territory, 841 F.3d 632, 641 (4th Cir. 2016). While there seemed to be some confusion on the issue at the hearing on Defendant's motion, a review of the briefs reflects that Plaintiff does not pursue an intentional discrimination claim, nor does she pursue a discriminatory impact claim; rather, her claims "are of the third type: a refusal to grant a reasonable accommodation and/or modification." Pl. Opp'n Memo 13.

In addition to asserting an FHA violation, Plaintiff seeks recovery pursuant to Section 504 of the Rehabilitation Act, which provides as follows:

> No otherwise qualified individual with a disability in the United States . . . shall, <u>solely by reason of her or his disability</u>, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . .

29 U.S.C. § 794(a) (emphasis added). Plaintiff asserts that when § 794(a) is applied in conjunction with 42 U.S.C. § 3604(f)(3)(A), such statutes require that Defendant not only allow reasonable structural modifications to Plaintiff's residence, but require that <u>Defendant pay for</u> such modifications. As an entity receiving Federal financial assistance, Defendant does not contest the fact that it has a legal obligation to fund certain structural modifications. Defendant does, however, highlight the fact that the Rehabilitation Act has a higher causation standard regarding proof of intentional discrimination, requiring a plaintiff to demonstrate that his or her exclusion from benefits resulted <u>solely</u> by reason of his or her disability. <u>See</u> <u>Thomas</u>, 841 F.3d at 641 (explaining that the Rehabilitation Act has a "stricter causation requirement than the . . . FHA").

While the parties generally agree on the applicable law, they have starkly conflicting positions as to whether Plaintiff has the burden to prove discriminatory animus in order to succeed on her reasonable accommodation and/or reasonable modification claims. Defendant asserts that Plaintiff must

demonstrate either that her disability was one of several factors motivating Defendant's challenged conduct (the FHA standard) or the sole factor motivating Defendant's challenged conduct (the Rehabilitation Act standard), whereas Plaintiff asserts that she need not satisfy either legal test.

Considering first the relevant FHA provisions, as set forth above, § 3604(f)(1) and (f)(2) state that it is unlawful to discriminate in housing matters "because of" a tenant's or prospective tenant's disability, and subsection (f)(3) goes on to state that "discrimination includes" the denial of reasonable accommodations and reasonable modifications. The statutory interpretation question before this Court is whether the accommodation and modification provisions set forth in § 3604(f)(3) are stand-alone provisions defining actionable discrimination, or whether they are merely a definitional provision that describes a type of discrimination that is potentially actionable under subsections (f)(1) and (f)(2), subject to the requirement that the plaintiff prove that such discrimination is "because of" the plaintiff's disability.

Beginning with the statutory text, the disputed language appears ambiguous as multiple interpretations appear "reasonable" when considered both in the context in which the operative language is used and in "the broader context of the statute as a whole." Ignacio v. United States, 674 F.3d 252,

254 (4th Cir. 2012) (quotation marks and citations omitted).[9] Such apparent ambiguity, therefore, warrants a more searching inquiry as to proper interpretation of the statute.

While it does not appear that the United States Court of Appeals for the Fourth Circuit has spoken on this issue, this Court finds that the Fourth Circuit would likely join its sister circuits in concluding that the FHA accommodation and modification provisions are stand-alone provisions defining actionable discrimination. Such interpretation avoids redundancy, comports with reason and common sense, and is consistent with the apparent purpose behind the accommodation/modification provisions. See Good Shepherd Manor Found., Inc. v. City of Momence, 323 F.3d 557, 562 (7th Cir. 2003) (explaining that failure to accommodate is "an alternative theory of liability" which would be "entirely redundant if it required proof that the defendants' actions were motivated by animus towards the handicapped," further noting that "to be

---

[9] Each of the potential "reasonable" interpretations, however, appears to have flaws. Although Plaintiff's brief does not engage in a textual analysis, Plaintiff's interpretation appears to ask the Court to read the term "actionable" into subsection (f)(3) in order to clarify that discriminatory intent has no place in the analysis. In contrast, while the "definitional" approach to subsection (f)(3) espoused by Defendant is facially more consistent with the opening phrase of subsection (f)(3), problems arise when such provision is considered in the context of the language that surrounds it. Specifically, if the word "discriminate" in subsection (f)(1) and (f)(2) is replaced with the definition provided in subjection (f)(3), the resulting provision is not only confusing, but appears to render subsection (f)(3) meaningless/superfluous, a construction that should be avoided "[w]here possible." Scott v. United States, 328 F.3d 132, 139 (4th Cir. 2003).

19

meaningful, it must be a theory of liability for cases where we assume there is a valid reason behind the actions of the city, but the city is liable nonetheless if it failed to reasonably accommodate the handicap of the plaintiff"). Notably, the almost universal real-world motivation behind a desire not to allow an exception to an in-place policy or practice established by a landlord or residential association is the desire to have across-the-board compliance with the policy, regardless of a tenant/homeowner's disability. Similarly, the consistent motivations behind a landlord's or residential association's desire not to allow a structural modification to an existing building are either the desire to maintain consistent aesthetics or the desire to prevent structural modifications being performed by any tenant, regardless of disability. If, as asserted by Defendant, a blind person, for example, was required to prove that the reason a landlord/association refused to allow a guide-dog exception to a no-pet policy was some degree of animus toward the blind tenant, as contrasted with the otherwise lawful desire to have no pets of any kind on the property in question, the protections of § 3604(f)(3) would be rendered virtually meaningless. Accordingly, this Court finds that to appropriately give effect to all separately numbered statutory clauses, the proper interpretation is that discriminatory animus is not a required element of proving a claim under

§ 3604(f)(3)(A) or § 3604(f)(3)(B). Such finding is supported by numerous federal cases to have addressed the issue. See Austin v. Town of Farmington, 826 F.3d 622, 627 (2d Cir. 2016), cert. denied, 137 S. Ct. 398, 196 L. Ed. 2d 297 (2016) (stating that neither subsection (A) or (B) of § 3604(f)(3) require that "the denial of modifications or accommodations be the result of a discriminatory animus toward the disabled"); Hollis v. Chestnut Bend Homeowners Ass'n, 760 F.3d 531, 540 (6th Cir. 2014) (explaining that "the McDonnell Douglas intent-divining test" is not applicable "to FHA reasonable-accommodation claims, which do not require proof of discriminatory intent," and that the proper test in the Sixth Circuit, and numerous sister circuits, focuses instead on the "operative elements" of § 3604(f)(3), to include whether the "proposed accommodation is reasonable and whether it is necessary to afford disabled persons an equal opportunity for enjoyment"); Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City, 685 F.3d 917, 922–23 (10th Cir. 2012) (labeling an FHA reasonable accommodation claim "a different sort of animal" that does not require proof of intentional discrimination nor proof of a systematic discriminatory effect); Hunter on behalf of A.H. v. District of Columbia, 64 F. Supp. 3d 158, 179 (D.D.C. 2014) (holding that FHA "'failure to accommodate' claims do not require proof of intentional discrimination"); Robert G. Schwemm, Housing

Discrimination Law and Litigation § 11D:8 n.5 (2017 update) (citing additional cases in support of such proposition); 148 A.L.R. Fed. 1 § 3[c] ("It has been expressly recognized by several courts that even if the defendant's conduct is not motivated by discriminatory intent and does not have a disparate impact on individuals with disabilities, it may nevertheless be found to be a violation of the reasonable accommodation mandate of 42 U.S.C.A. § 3604(f)(3)(B)."); see also Bryant Woods Inn, Inc. v. Howard Cty., Md., 124 F.3d 597, 603 (4th Cir. 1997) (stating, without discussing discriminatory intent/animus, that the FHA "requires an accommodation for persons with handicaps if the accommodation is (1) reasonable and (2) necessary (3) to afford handicapped persons equal opportunity to use and enjoy housing" (citing 42 U.S.C. § 3604(f)(3))).[10]  Having made such

---

[10] In Scoggins v. Lee's Crossing Homeowners Ass'n, 718 F.3d 262, 272 (4th Cir. 2013), the Fourth Circuit repeated such three element test. Other circuits have described the test as having four, or even five elements, although this Court is unaware of any circuit court that has identified discriminatory intent/animus as an element.  See Olsen v. Stark Homes, Inc., 759 F.3d 140, 156 (2d Cir. 2014) (identifying the five elements as: "(1) that the plaintiff or a person who would live with the plaintiff had a handicap within the meaning of § 3602(h); (2) that the defendant knew or reasonably should have been expected to know of the handicap; (3) that the accommodation was likely necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation requested was reasonable; and (5) that the defendant refused to make the requested accommodation").  While the Fourth Circuit has not expressly recognized the denial of a requested accommodation as an "element" of the claim, the Fourth Circuit appeared to acknowledge in Scoggins that a failure to accommodate claim is "premature" unless there has been either a denial or a constructive denial of the requested accommodation.  Scoggins, 718 F.3d at 271-72.  Moreover, the Fourth Circuit stated, in Bryant Woods Inn, that "a violation occurs when the disabled resident is first denied a reasonable accommodation."  Bryant

22

preliminary legal finding, the Court turns to addressing whether a reasonable juror could rule in Plaintiff's favor on her reasonable accommodation claim or reasonable modification claim.

### B. Reasonable Accommodation – § 3604(f)(3)(B)

First, as argued by Defendant, Plaintiff fails to advance any evidence that her request for ramp construction, the installation of grab bars in her bathroom and/or a tub transfer bench/seat, constituted requests for a reasonable accommodation with respect to any of Defendant's rules, policies, practices, or services. 42 U.S.C. § 3604(f)(3)(B). Rather, based on the record before the Court, such requests seek structural modifications to an existing residence, and are therefore governed by 42 U.S.C. § 3604(f)(3)(A). Compare 24 C.F.R. § 100.204 (providing the following examples of requests for a reasonable accommodation under § 3604(f)(3)(B): (1) a blind applicant for rental housing requesting an exception to the "no pets policy" to accommodate his service dog; and (2) a mobility impaired applicant for housing requesting an exception to the "first come first served" parking space policy to allow the assignment of a parking space close to his apartment); with 24 C.F.R. § 100.203 (providing the following example of a reasonable modification under § 3604(f)(3)(A): "[a] tenant with a handicap ask[ing] his or her landlord for permission to

Woods Inn, 124 F.3d at 602.

install grab bars in the bathroom at his or her own expense");
see Nichols v. Carriage House Condominiums at Perry Hall Farms,
Inc., No. CIV.A. RDB-14-3611, 2015 WL 4393995, at *5 (D. Md.
July 15, 2015) (categorizing the plaintiff's request for a
driveway extension as a "request for a reasonable modification,
not a request for a reasonable accommodation," noting that the
plaintiff did not point to any "'rules, policies, practices, or
services' from which he needs relief"); Weiss v. 2100 Condo.
Ass'n, Inc., 941 F. Supp. 2d 1337, 1344 (S.D. Fla. 2013)
(explaining that the "plain language of the FHA defines
accommodations in terms of reasonable accommodations in 'rules,
policies, practices, or services'" and makes "no mention of
adjustments or improvements to existing structures").
Accordingly, no reasonable juror could find that Defendant
violated the prohibition on refusing to make a reasonable
accommodation in rules, policies, practices or services by
failing to make requested structural changes.

To the extent Plaintiff asserts that she requested a
reasonable accommodation in the form of a transfer to a
handicapped accessible unit owned or leased by Defendant's
program, the record demonstrates that: (1) Defendant did not own
or lease any accessible units that met Plaintiff's needs that

were vacant between late January and early March of 2016;[11]

(2) Defendant did not have the capacity within its program requirements to acquire a new property to meet Plaintiff's needs, ECF No. 17-7, at 30-31;[12] and (3) Defendant reasonably took steps to investigate whether it had the lawful authority to "force" other tenants out of units owned/leased by Defendant that were accessible and/or easily converted to being accessible, ultimately opting instead to "incentivize" a tenant to vacate a ground-floor three bedroom accessible unit in early

---

[11] As noted herein, Plaintiff was offered a transfer to a smaller two bedroom unit shortly after she made her accommodation request; however, Plaintiff identified such unit as too small for her family's needs.

[12] Even if it is assumed, in the absence of any supporting evidence, that Defendant could have found a way to modify its program to acquire another property for Plaintiff as part of Defendant's program, Defendant is not legally obligated to provide Plaintiff her preferred choice of accommodation/modification, but rather, must only provide a "reasonable" accommodation or modification. Weiss, 941 F. Supp. 2d at 1344, 1347; Istre v. Hensley P'ship, No. 3:15cv127, 2017 WL 744577, at *4 (E.D. Tenn. Feb. 23, 2017); see Griffin v. Holder, 972 F. Supp. 2d 827, 849 (D.S.C. 2013) (reaching the same conclusion in the context of an accommodation sought from an employer under the Rehabilitation Act); see also Bryant Woods Inn, 124 F.3d at 604 (explaining that the court's inquiry into whether a requested accommodation was "reasonable" includes considering "whether alternatives exist to accomplish the benefits more efficiently"). Here, within 32 days of receiving the note from Plaintiff's doctor, Defendant had done all the research and preparation necessary (including getting three quotes from contractors and securing necessary funding approvals through HUD) to arrange to have a ramp built and grab bars installed at Plaintiff's current residence and/or to transfer Plaintiff to a three-bedroom accessible residence that would meet her needs. While Defendant appears to have had the legal right to choose the reasonable option it preferred, Defendant allowed Plaintiff to choose which option she preferred, and Plaintiff herself elected the option with the longer wait time. In light of such undisputed facts, to include Plaintiff's election of the option with the longer lead time, no reasonable juror could conclude that Plaintiff was denied a reasonable accommodation for failure to transfer her to an accessible unit.

25

March of 2016 so that Plaintiff could move into such residence.[13] ECF No. 15-2, at 70. In light of the fact that Defendant had no accessible units available at the end of January 2016 when Plaintiff made her request, but Defendant still affirmatively acted to move another tenant and, within approximately six weeks from Plaintiff's initial request for an accommodation, had a final plan in place to transfer Plaintiff into an accessible unit, no reasonable factfinder could conclude that Plaintiff was denied a reasonable accommodation in the form of a transfer to another housing unit.[14]

## C. Reasonable Modification - § 3604(f)(3)(A)

Turning next to Plaintiff's request for a reasonable modification in the form of the installation of a ramp and grab bars at her current unit, the Court agrees with Defendant that, as a matter of law, Plaintiff cannot recover under the FHA because the § 3604(f)(3)(A) requires a tenant to personally fund reasonable modifications, and it is undisputed that Plaintiff

---

[13] Plaintiff fails to present evidence indicating that she requested to move into such unit immediately upon the former tenant's exit (prior to painting, repair, installation of grab bars, etc.). Such a request, if made, may have been a request for a reasonable accommodation.

[14] Not only were Defendant's actions reasonable as a matter of law, but Plaintiff was not denied the accommodation. Defendant took steps to secure the conforming unit within approximately one month from receiving the note from Plaintiff's doctor, informing Plaintiff that Defendant needed additional time for the tenant to vacate the unit as well as time for repairs/modifications. Moreover, Plaintiff accepted the unit over the offered alternative of structural modifications to Plaintiff's current unit. Plaintiff subsequently decided to leave Defendant's program one week after electing to "wait" for the three bedroom unit.

26

never offered to pay for (and was not capable of paying for) the modifications at issue. 42 U.S.C. § 3604(f)(3)(A);' Nichols, 2015 WL 4393995, at *5. That said, Plaintiff appears correct that the legal analysis is different in a case implicating both § 3604(f)(3)(A) and § 504 of the Rehabilitation Act, with § 504 prohibiting a program that receives federal funding from excluding disabled individuals solely by reason of their disability. Notably, here, Defendant acknowledges that, as a recipient of federal funds, it "may have an obligation under Section 504 of the Rehabilitation Act to pay for a modification to the premises that is reasonable and necessary." Def's Reply 7, ECF No. 17; see 29 U.S.C. § 794(c) (referencing the obligation to make "structural alterations" in order to conform with Section 504 of the Rehabilitation Act); cf. Doe v. Pfrommer, 148 F.3d 73, 82-83 (2d Cir. 1998) (noting that while there is not any statutory provision addressing reasonable accommodations under the Rehabilitation Act, "the Supreme Court has ruled that eligibility for a federally assisted benefit 'cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made.'" (quoting Alexander v. Choate, 469 U.S. 287, 301 (1985))). Assuming that, on these facts, Defendant was legally

27

obligated to fund reasonable modifications to Plaintiff's residence in the form of construction of a ramp and installation of grab bars, summary judgment in Defendant's favor is still warranted because Plaintiff fails to demonstrate that she was denied such reasonable modification.

As outlined in the factual summary above, Defendant immediately responded to Plaintiff's January 25, 2016, request for an accommodation/modification, stayed in contact with Plaintiff on a weekly and almost daily basis providing updates on the process, reasonably requested documentation from Plaintiff's doctor to determine whether Plaintiff's disability was short-term due to her pregnancy, or a long-term condition, investigated the cost to modify Plaintiff's residence versus other options, and reached out to HUD and other government entities for guidance after it was determined that the modifications could cost more than $8,000. Defendant obtained three quotes for the ramp in a relatively short time period and took steps to have HUD modify Defendant's grant, which was necessary to fund the ramp construction. Critically, within six weeks of Plaintiff's original request, and within less than five weeks from receiving documentation from Plaintiff's doctor, Defendant had lined-up two viable and reasonable final options – the structural modification of Plaintiff's residence, to include a ramp to be fully funded by Defendant, or a near-term move to a

handicap accessible three-bedroom unit. Plaintiff elected to "wait" for the option that would take more time rather than have her current unit modified. At that point, Plaintiff made the decision to reject the reasonable modification offered, and cannot now establish that she was "denied" a reasonable modification because the ramp or grab bars were never built/installed. Accordingly, based on this case specific record, to include a detailed timeline involving Defendant's ongoing efforts to investigate Plaintiff's medical condition, investigate Defendant's legal obligations, investigate the feasibility and cost of ramp construction and grab bar installation, and investigate how to permissibly fund this relatively substantial capital expenditure, no reasonable juror could conclude that Plaintiff was denied a reasonable modification under § 3604(f)(3)(A), even when such provision is applied in conjunction with the Rehabilitation Act.

### D. Constructive Denial of Accommodation/Modification

As discussed above in footnote 9, regardless of whether it is properly labeled an "element" of Plaintiff's cause of action, Plaintiff cannot obtain relief absent a showing that she was "denied" a reasonable accommodation or reasonable modification. As analyzed immediately above, the undisputed evidence demonstrates that no reasonable juror could conclude that Plaintiff can satisfy such requirement, rendering summary

judgment proper. Notwithstanding such finding, in light of Plaintiff's arguments in opposition to summary judgment, the Court finds it necessary to separately comment on Plaintiff's contention that she was constructively denied the requested accommodation or modification.

The Fourth Circuit has recognized that the denial of a request for a reasonable accommodation "need not be explicit, but rather may be treated as a 'constructive' denial based on the decision maker's conduct." Scoggins v. Lee's Crossing Homeowners Ass'n, 718 F.3d 262, 271-72 (4th Cir. 2013). In Scoggins, the Fourth Circuit concluded that the plaintiff's request for an accommodation was constructively denied when the defendant's board of directors twice "tabled" the request "pending a decision to seek additional information from the plaintiffs, but the board did not ask the plaintiffs to provide such information until more than 15 months later." Id. at 272 (emphasis added). Similarly, the Eleventh Circuit has found that a delay of over six months to respond to a request for accommodation constituted a constructive denial. Bhogaita v. Altamonte Heights Condo. Ass'n, Inc., 765 F.3d 1277 (11th Cir. 2014). The Eleventh Circuit reached such conclusion notwithstanding the defendant's contention that it was still in the process of conducting a "meaningful review" of the plaintiff's request, finding that, based on the case specific

30

facts, the supplemental information requested by the defendant in that case was either already in its possession or was irrelevant to the accommodation decision. Id. at 1286. The Eleventh Circuit did, however, expressly recognize the defendant's right to perform an appropriate investigation before granting a requested accommodation, explaining as follows:

> The FHA does not demand that housing providers immediately grant all requests for accommodation. Schwarz v. City of Treasure Island, 544 F.3d 1201, 1219 (11th Cir. 2008) ("'[T]he duty to make a reasonable accommodation does not simply spring from the fact that the handicapped person wants such an accommodation made.'" (quoting Prindable v. Ass'n of Apt. Owners, 304 F. Supp. 2d 1245, 1258 (D. Haw. 2003), aff'd sub nom. DuBois v. Ass'n of Apt. Owners, 453 F.3d 1175 (9th Cir. 2005))). Once a provider knows of an individual's request for accommodation, the provider has "'an opportunity to make a final decision . . ., which necessarily includes the ability to conduct a meaningful review'" to determine whether the FHA requires the requested accommodation. Id. (quoting Prindable, 304 F. Supp. 2d at 1258).

> The failure to make a timely determination after meaningful review amounts to constructive denial of a requested accommodation, "as an indeterminate delay has the same effect as an outright denial." Groome Res. Ltd. v. Parish of Jefferson, 234 F.3d 192, 199 (5th Cir. 2000). The Joint Statement of two federal agencies counsels similarly: "An undue delay in responding to a reasonable accommodation request may" constitute a failure to accommodate. Department of Justice and HUD, Joint Statement on Reasonable Accommodations at 11 (May 17, 2004), available at www.hud.gov/offices/fheo/library/huddojstatement.pdf (last visited August 7, 2014) ("Joint Statement").

Id. at 1285-86 (footnote omitted).

Here, the record clearly demonstrates that Defendant immediately began its investigation into whether Plaintiff required an accommodation and/or modification, considered if, and how, such requests could be satisfied, and made parallel efforts to both modify Plaintiff's existing premises and find her a new one. In light of the substantial expense of ramp construction due to the fact that the layout of Plaintiff's residence necessitated a large exterior ramp with platforms, Defendant needed to obtain additional estimates and obtain outside approvals regarding funding prior to making a final decision on the planned modifications. Moreover, the case specific facts demonstrate that Defendant had legitimate concerns warranting further investigation into both the facts, and the law, with respect to whether Defendant was legally obligated to modify Plaintiff's apartment if she was unable to secure the around-the-clock personal assistance that Plaintiff's own doctor had stated was necessary.[15] Furthermore, Plaintiff's words and actions in early 2016 repeatedly suggested that she

---

[15] Such concerns are not tied by Plaintiff in any way to a discriminatory animus, and moreover, appear to find some support in the law. See 42 U.S.C. § 3604(f)(9) ("Nothing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals. . . ."); Scoggins, 718 F.3d at 272-73; Casa Marie, Inc. v. Superior Court of Puerto Rico for Dist. of Arecibo, 988 F.2d 252, 270 n.22 (1st Cir. 1993). While the fire Plaintiff started in her kitchen occurred after final accommodation/ modification options had been presented, the incident underscores the legitimacy of: (1) Defendant's concerns regarding Plaintiff's ability to safely live alone; and (2) Defendant's ongoing contact with APS and CPS.

was considering leaving Defendant's program, an event that would obviously render the requested modification/accommodation unnecessary. Accordingly, even after considering all facts and inferences in Plaintiff's favor, Plaintiff fails to point to evidence on which a reasonable juror could conclude that a constructive denial occurred in this case.[16] Such conclusion is informed by, but not driven by, cases cited by Defendant

[16] At oral argument, Plaintiff's counsel argued that the grab bars in the bathroom were an extremely pressing need for Plaintiff and that they should have been installed by Defendant far more quickly. Plaintiff, however, does not point to any record evidence demonstrating that Plaintiff at any point informed Defendant that this was a critical need, that it should be separated from her other requests and evaluated independently, and/or that the absence of such bars were making her daily life unmanageable (as suggested at oral argument). To the contrary, some of the record evidence arguably indicates that it was Plaintiff's difficulty exiting her home due to her need for a wheelchair that was creating the most pressing concerns. The Court further notes that the record indicates both that: (1) Defendant had been informed that Plaintiff was wearing adult diapers during the relevant timeframe; and (2) Unbeknownst to Defendant, Plaintiff was receiving in home care from her boyfriend in the evenings. Both of these facts offer useful context to counsel's suggestion that the grab bars in the bathroom was such a critical and immediate need that it warrants separate analysis. Moreover, as referenced herein, the fact that, when presented with two reasonable options to meet her needs, Plaintiff opted to "wait" for the option that would take longer for Defendant to provide, further undercuts counsel's argument. Notwithstanding the countless contacts between Plaintiff and Defendant, including emails authored by Plaintiff, there is no evidence indicating that Plaintiff placed any emphasis on requested modifications to her bathroom, nor is there evidence demonstrating that she requested an interim modification during the time in early March after she elected to wait for the three bedroom accessible unit. Additionally, the record demonstrates that Defendant did take steps to install the grab bars through its own staff prior to the completion of the ramp estimates, but Defendant's employees felt unqualified to make such structural modification (thus requiring a quote from a professional). Finally, it is clear from the record that during the month of February, Plaintiff on more than one occasion indicated that she was not going to remain in Defendant's program. Considering all of these facts, although Defendant might have been able to be more efficient in addressing this one subpart of Plaintiff's modification request, there is insufficient evidence to support a reasonable juror in concluding that any delays in installing the grab bars constituted a "constructive denial" of Plaintiff's request for a reasonable modification to her home.

regarding constructive denials, as each individual case requires a fact-specific inquiry. See, e.g., Prindable, 304 F. Supp. 2d at 1259 (finding that a "period of less than two months" was not an "'indeterminate delay' under the circumstances" of that case, which required investigation into the plaintiff's need for a service animal).

This Court's above finding regarding the absence of a constructive denial is based on temporal analysis, considering the events occurring between Plaintiff's request on January 25, 2016, and the accommodation and modification offered by Defendant on March 7, 2016. However, both Plaintiff and Defendant suggest that this Court should not focus solely on the elapsed period of time, but should also consider whether there is evidence of discriminatory animus on Defendant's part, because some federal courts have recognized that evidence of bias informs the determination of whether there was a "constructive denial" under the FHA. See Logan v. Matveevskii, 57 F. Supp. 3d 234, 271 (S.D.N.Y. 2014) (citing cases). In fact, the district court in Logan found that bias was not only "relevant" to such inquiry, but that "to make out a claim of constructive denial, a plaintiff bears the burden of demonstrating discriminatory intent." Id. Based on this Court's finding that bias is not an element of an FHA reasonable accommodation/modification claim, as well as the absence of any

discussion of "bias" by the Fourth Circuit in Scoggins as part
of its constructive denial analysis, this Court questions the
degree to which bias is relevant to the constructive denial
analysis in an FHA case, and has even greater reservations at
the suggestion that bias must be proven to demonstrate a
constructive denial.[17]    Notwithstanding such reservations,
assuming, without deciding, that bias is relevant to proving a
constructive denial because it can offer context to the length
of a defendant's delay in ruling on an accommodation/
modification request, this Court agrees with Defendant that
Plaintiff's case-specific evidence of bias does not advance her
position in any meaningful way because no reasonable juror could
find that Plaintiff's evidence, which is grounded almost
entirely in conjecture, demonstrates bias associated with
Plaintiff's disability.

    First, there is no direct evidence of any kind
demonstrating an intent to delay by Defendant and/or that
Defendant took affirmative steps to delay the process in any
way, let alone any evidence that links any purported delay to a

---

[17] Of course, a plaintiff could always endeavor to prove that she was
discriminated against in conditions, or privileges of a rental unit or in
the provision of services or facilities in connection with such dwelling,
because of her handicap.  42 U.S.C. § 3604(f)(2).  But such a claim would
be a claim of direct discrimination, not a claim of failure to provide a
reasonable accommodation/modification.  Here, Plaintiff expressly asserts
that she only advances a claim based on Defendant's alleged failure to
provide a reasonable accommodation or modification (a sensible position
in light of the absence of evidence of discriminatory animus).

discriminatory intent. Second, there is no material circumstantial evidence of an intent to delay, even when all facts and reasonable inferences are viewed in Plaintiff's favor.[18] Third, with respect to Plaintiff's assertion that an inference of bias is established through Defendant's repeated calls to CPS and APS, calls that Plaintiff speculatively asserts were made in an effort to drive Plaintiff out of Defendant's program, there is insufficient evidence for a reasonable juror to conclude that such actions were motivated in any way by a discriminatory animus, with Plaintiff's position relying entirely on conjecture. Notably, the record establishes that Defendant was helping to coordinate services/benefits that Plaintiff was receiving from various government agencies during

---

[18] Plaintiff asserts in support of her constructive denial argument that, in late 2015, Defendant unreasonably failed to repair or replace the previously installed toilet lift seat and/or install a useful shower grab bar in Plaintiff's bathroom. See ECF No. 16-13. Defendant asserted at oral argument that, factually, Plaintiff never communicated this concern to Defendant in 2015, alternatively arguing that, even if she did, any claim predicated on Defendant's failure to act in 2015 is barred by the statute of limitations. Plaintiff responded at oral argument by disputing Defendant's factual version of events, noting that although there is no documentary evidence supporting Plaintiff's position, consistent with her deposition testimony, Plaintiff would testify at trial that she communicated her complaints to Defendant in late 2015. Importantly, Plaintiff further indicated at oral argument that she is not proceeding separately on a claim that she was denied an accommodation/modification in 2015, but rather, raises such issue as context for Plaintiff's contention that Defendant constructively denied her January 25, 2016, request. Accordingly, a limitations ruling on this issue is not necessary. This Court is, however, required to view the disputed facts in Plaintiff's favor, and finds that Plaintiff's testimonial evidence of 2015 conduct could be credited by a jury, and thus could offer some context to Defendant's 2016 behavior. That said, any inference of discriminatory intent that could reasonably be drawn from the 2015 behavior is insufficient to support a verdict in Plaintiff's favor when considered in conjunction with the detailed record of Defendant's 2016 actions.

36

the relevant time frame, and was reaching out to "CPS and APS re: additional services [Plaintiff] qualifies for." ECF No. 16-21. Moreover, Defendant's reports to CPS and APS were made after specific events raised legitimate concerns about both Plaintiff's well-being and the well-being of Plaintiff's minor children, and it was thus beneficial for CPS and APS to have this information when determining what level of aid to provide to Plaintiff.[19] There is not a scintilla of record evidence suggesting that CPS was being contacted in order to threaten Plaintiff (such as through efforts to take her children away), and the record evidence from CPS does not support Plaintiff's speculative assertion of a nefarious motive, but instead demonstrates that CPS was focused on providing additional assistance to Plaintiff's family. Such contacts, without any direct, or compelling circumstantial evidence suggesting a discriminatory animus,[20] are insufficient as a matter of law to

---

[19] To reiterate, Plaintiff was pregnant, raising three minor children largely on her own, reported to be confined to her bed or a wheelchair, and according to the doctor's note provided to Defendant, "she requires 24/7 assistance for all mobility and is unsafe to be living on her own." ECF No. 15-11. At no point during the relevant time frame was Plaintiff actually receiving such 24/7 care. In fact, Plaintiff was not receiving at least some of the in-home care that had been authorized by outside agencies. See ECF No. 16-31; cf. 17-4. While the parties dispute whether Defendant was legally obligated to make each and every contact to CPS/APS based on its position as a "mandatory reporter" under Virginia law, such question need not be resolved by the Court because even if one or more contacts was not mandated by law, there is not a scintilla of evidence suggesting a nefarious motive behind Defendant's contacts with state or federal agencies.

[20] At best, the record reflects hesitation on Defendant's part regarding

37

support a reasonable juror's conclusion that Plaintiff's evidence of discriminatory animus/bias would alter the outcome of the constructive denial analysis.[21]

In sum, Plaintiff's assertion that she was "constructively denied" a reasonable accommodation and/or modification fails as the evidence is so one-sided that Defendant must prevail as a matter of law. The Court's conclusion that no reasonable juror could find in Plaintiff's favor on this issue is grounded in the Court's finding that the proper inquiry is to focus on the timeline of events to determine whether a constructive denial occurred. However, the Court alternatively finds that, to the extent evidence of bias is relevant and/or required as part of such inquiry, Plaintiff's speculative evidence of bias/animus is

---

providing costly structural modifications before confirming that Plaintiff was staying in her unit; however, nothing in the record ties such legitimate program-based concerns to any form of bias, particularly in light of the fact that: (1) the proposed modifications were substantial and were to be funded out of Defendant's own budget, raising an obligation for Defendant to investigate both the cost of the modifications and available funding methods; and (2) the individual requesting the modifications asserted a desire to leave Defendant's program on more than one occasion. See, e.g., ECF No. 16-23.

[21] This Court does not "weigh" the evidence and determine the truth of the matter at the summary judgment stage, but is called on to determine whether there is a genuine issue for trial because the evidence presents a sufficient and material disagreement that requires submission to the jury. In the course of assessing whether the evidence is so one-sided that the moving party should prevail as a matter of law, the Court notes that the record contains additional evidence favorable to Defendant that suggests an absence of bias, such as the fact that Defendant repeatedly took steps to assist Plaintiff with her disability, to include reaching out to Plaintiff's doctor in early March in order to help align the delivery of Plaintiff's hospital bed and electric wheelchair with her planned move into the three bedroom accessible unit. ECF No. 16-19.

38

insufficient as a matter of law to support a finding of constructive denial.

### IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED**. ECF No. 14. The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

_____ /s/ _____

Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
January **23** , 2018